### Case No. 12,031.

#### RONALD v. BARKLEY et al.

[1 Brock. 356.][1]

Circuit Court, D. Virginia. Nov. Term, 1818.

ELEGIT — POSSESSION — RIGHT TO HOLD OVER — EJECTMENT—PROFITS—IMPLIED CONTRACT—GUARDIAN.

1. It is the well settled modern practice, that the officer who executes a writ of elegit, does not put the creditor in actual possession of the land, but gives him only a legal possession, which he must enforce by ejectment. If the actual possession be withheld by the owner of the land, without the fault of the tenant by elegit. he will have a right to hold over, after he acquires actual possession, for the period during which his debtor held the adverse possession; but if, from the act of the creditor himself, or a third party, the rents and profits of the extended lands be not received, the creditor cannot hold over, but his estate expires when his debt might have been satisfied.

2. A judgment was obtained, in 1799, against two infant heirs, and in August, 1800, a writ of elegit was sued out on this judgment, and executed on lands and personalty of the infants. The heirs retained possession of the lands about five years, when ejectment was brought by the tenant by elegit to reduce them into his possession. The guardian of the infants, in the meantime, had been in perception of the profits, and had, for the most part, failed to apply them in discharge of the debt for which the lands were extended. In 1807, the extended lands were sold under a decree, at the suit of other creditors, subject to the elegit. In 1805, the ejectment was brought by the elegit creditor, and, pending that suit, viz., on the 28th of January, 1806, the guardian of the infants conveyed a tract of land which he had purchased with the funds of the infants, and for their use, in trust, to secure the debt due to the elegit creditor, and in exoneration of the lien created by the elegit, and the ejectment was dismissed. The guardian had purchased the land conveyed by him in trust, at a sale made by a commissioner of the court of chancery, but the legal title was not conveyed to him, and in the trust deed, the rights under the elegit were reserved until a legal title could be made. A suit being brought by the heirs to compel a conveyance to their guardian in trust, discharged of that incumbrance, it was *held*, that although where ejectment is brought within reasonable time from the service of the writ of elegit, it may amount to prima facie evidence, that the possession, at the institution of the suit, was originally adversary, and the creditor may be entitled to hold over; yet, in this case, the creditor having postponed the assertion of claim, for five years, her acquiescence in the possession of the heirs, must be inferred, and that the purchasers are not responsible for the profits which accrued during the time that the lands were held by the heirs, with the acquiescence of the elegit creditor. They are liable

only for the profits accruing during the unexpired term.

3. The occupation of the extended lands, by the infants, must be considered as an occupation under an implied contract, which the guardian had a right to make for them, and the perception of the profits by him, is, in this suit, to be considered as a perception by them.

4. The power of the guardian over his ward's estate, enabled him to bind the land conveyed in the deed of the 28th of January, 1806, to the extent of the estimated value of the lands bound by the elegit, during the period for which those lands remained in the possession of the infant heirs, with the consent of the elegit creditor.

[Cited in Cheney v. Roodhouse, 135 Ill. 265, 25 N. E. 1,021.]

In November, 1799, Anne Barkley obtained a judgment in this court, against Elizabeth and Anne Ronald, infant heirs of —— Ronald, for the sum of $3,011.50, with interest, at the rate of five per cent., from the 20th of June, 1791, till paid. On this judgment, a writ of elegit was issued, which was levied on land and negroes, in the counties of Goochland and Powhatan, on the 6th and 8th of August, 1800, respectively, which were estimated, by the jury, at the yearly value of $555.50. These lands remained in the peaceable possession of Ronald's heirs, until some time in the year 1805, when ejectments were brought by Anne Barkley, to obtain possession of them. On the 28th of January, 1806, an agreement was entered into between John Wickham, the attorney of Anne Barkley, and William Bently, one of the guardians of Ronald's heirs, in pursuance of which a deed was executed by Bently, to Edward Carrington and John Wickham, in trust, to secure the payment of Anne Barkley's debt, with interest, at 6 per cent., conveying a tract of land, containing 600 acres, lying in the county of Goochland, which was sold under a decree of the court of chancery, of this state, in July, 1797, and of which William Bently became the purchaser, but of which he had received no conveyance. The rights, under the writ of elegit, were reserved, as Bently did not possess the legal title to the land in Goochland, and the writs of ejectment were dismissed. Bently, having failed to make the payments, stipulated in this deed, the attorney of Anne Bently advertised the Goochland land for sale, under the deed of trust. The sale was forbidden by Ronald's heirs, who alleged that the land was purchased by Bently, for them, which allegation is fully sustained by the testimony in the cause. In December, 1807, on the motion of Anne Barkley to dissolve the injunction, the court directed the marshal to rent out the extended land, and the trust land, which was accordingly done. If the course of the elegit had not been arrested by any act of the parties, the debt would have been discharged in October, 1810, but in consequence of the lands remaining in the possession of the plaintiffs, or of their guardian Bently, and of his failure to pay the yearly

[1] [Reported by John W. Brockenbrough, Esq.]

value at which they were extended, a considerable part of Barkley's debt remained unpaid. At the suit of other creditors, the extended lands were sold by order of this court, subject to the incumbrance created by the elegit already mentioned. The sale was made in August, 1807, and the purchasers were informed, by the commissioner who conducted it, that the debt of Barkley would be paid by the operation of the extent, in October, 1810. The parties, defendants to this suit, were Anne Barkley, the tenant by elegit, John Wickham, her attorney and surviving trustee under the deed of January 28th, 1806, William Bently, the guardian of the plaintiffs and grantor in that deed, James Pleasants, the commissioner who sold the land under the decree of the court of chancery in 1797, and the purchasers of the extended lands, at the sale of August, 1807. The plaintiffs insisted, that as their guardian was indebted to them in a great amount, and paid for the land in Goochland, not with his own funds, but with theirs, they were entitled to that land, unincumbered by his contract. The defendant, Anne Barkley, contended, that she had still a right to satisfy her judgment out of the extended lands, or, if not, out of the land contained in the deed of January, 1806. The purchasers insisted, that they were not liable beyond the legal operation of the extent, viz., from the date of their purchase until October, 1810. Bently did not answer, and the answer of James Pleasants was merely formal.

MARSHALL, Circuit Justice. 1st. The court will first consider the claim of Anne Barkley on the purchasers. It seems well settled, in modern practice, that the officer who executes an elegit does not put the creditor in actual possession of the land, but gives him only a legal possession, which he must enforce by ejectment. It seems, also, to be settled, that if the actual possession be withheld by the owner of the land, without the fault of the tenant by elegit, he will have a right to hold over; but if, from the act of the creditor himself, or of a third person, the rents and profits of the extended lands be not received, the creditor cannot hold over, but his estate expires when his debt might have been satisfied. How do these principles apply to the facts of this case?

From August, 1800, when the inquest was taken, to some time in the year 1805, when the ejectment was brought, the creditor appears to have acquiesced entirely in the possession of Ronald's heirs. There is no reason to suspect, that their possession was not with her full assent other than is furnished by the ejectment brought in 1805. It will not be denied, that an ejectment brought within a reasonable time may amount to prima facie evidence, that the possession, thus adversarily maintained, was originally adversary; but it cannot be admitted, that the creditor, after this long and quiet acquiescence, can be

allowed to say, that she has been held out against her will. In this case, the creditor does not say it. She says, she was not bound to bring her ejectment. If, by this, her counsel intends to say, that she might, for an unlimited time, leave Ronald's heirs in the reception of the profits, and keep her elegit in force, I answer, that I think the law is otherwise. It has been adjudged and settled, that the estate by elegit continues, not until the debt be actually satisfied, but until it might have been satisfied. This principle is entitled to peculiar respect, where third persons are interested. The creditors of Ronald had rights which could not be suspended or impaired by these arrangements. Nor can it avail Mrs. Barkley, as against the purchasers, that they received the possession from Ronald's heirs, subject, as they held it, to the elegit. They received a right to the possession, whenever the elegit should, in law, expire, from the creditors at whose suit the lands were sold; and their taking immediate possession, could not alter or postpone the right, unless by special contract.

I think it, then, too clear for controversy, that the profits for the time between the inquest and the service of the ejectment, are to be deducted from the debt, so far as respects the purchasers, in like manner as if they had been actually received. The time between the service of the ejectment, and the deed of January, 1806, may admit of more doubt. The non-delivery of possession, when demanded by the tenant by elegit, does not appear to me to be a tort, for which the guardian is alone personally responsible. The possession being the possession of the infants, continued for them by their guardian, I rather incline to the opinion, that it is such a holding by the infants, as prolongs the term of the elegit. I have felt, and do feel, great doubts on this part of the case. But it must be decided, and I think the objections to this, less weighty than those to the contrary opinion. If the term might have been prolonged, this is the legal effect of the ejectment on the estate by elegit, and by that legal effect the purchasers are bound. I doubted, whether the purchasers could be required to take notice of an ejectment, which was dismissed; but, be this as it may, they are bound by the elegit, according to its legal extent, of which they must take notice.

I come next, to consider the claim of Mrs. Barkley, on the lands on the tract of 600 acres in Goochland, which is contained in the deed of January, 1806. This claim is rendered one of peculiar hardship, by the waste and havoc committed by this guardian, on the estate entrusted to his care. To determine, whether any part of the loss, and if any, what part, ought to fall on Mrs. Barkley, requires an attentive consideration of the transactions which have taken place. When the judgment in question was obtained, and the writ of elegit was issued, the land on which it was served, was in possession of

Ronald's heirs. This possession was not changed by the service of the writ. If, as has been already decided in considering the rights of the purchasers, they remained in possession, with the assent of Anne Barkley, they must be considered, unless the contrary appear, as retaining that possession, under an agreement to pay the annual value, at which the land was estimated in the inquest. As infants, they could not themselves make this contract. Could their guardian, legally make it for them? The power of guardians does not seem to be precisely defined. They may certainly do many acts, which bind the estate of their wards; and among others, they may remove encumbrances and make leases, especially if such acts are for the benefit of the infants. This elegit was an encumbrance, which I am not satisfied, the guardian might not contract to remove, in whole, or in part. Nor do I perceive, if he may make a lease of the lands of his ward, why he may not get in a lease, or an encumbrance, in the nature of a lease, of that estate. It is, I believe, not to be controverted, that these acts may be directed by a court of chancery, and would be directed, on being satisfied, that the proposed contract was for the interest of the infants. And, I think, few will deny, that had an application to that court, been made in this case by the guardian, its sanction would have been given to the acquisition of this estate by elegit, unless some suspicion existed of his unfaithfulness, in the performance of his trust. The infants were in possession of a number of slaves, and of a large landed estate. There are few, who would not think it more advisable, to retain both in their own possession, if practicable, than to let the lands be cultivated by a tenant by elegit, and the slaves, composed as they are, of men, breeding women, and children, to pass into the hands of the highest bidder. No court, in a common case of this description, would refuse its sanction to a contract, by which the infants retained possession of the property.

The great objection, generally, to the exercise of the power of a guardian to purchase, is, that he changes thereby the nature of the estate, by converting personal into real estate. Even this might be sometimes allowed, as would appear from the opinion of the chancellor, in the case of Inwood v. Twyne, 2 Amb. 417. But, in this case, there is no change in the nature of the estate. The whole operation is, the taking in an encumbrance, in the nature of a lease for years.

If I was of opinion, that this was a case in which a previous application to a court was necessary, I should be much inclined to say, that a contract, which the court would certainly have directed, ought to be protected, as far as respects a third person. But I do not think an application was necessary. The general power of a guardian, in my opinion, extends to it; and, as an application to a court must be attended with expense, there

is no reason why it should be made. Had the guardian honestly applied the profits of the term, this transaction could not have been shaken in any court; and for his misapplication of them, the creditor cannot be responsible. I am, therefore, of opinion, that the occupation of the extended lands by the infants, must, under the circumstances of this case, be considered as an occupation under an implied contract, which the guardian had a right to make for them, and that the perception of the profits by him, is, in this suit, to be considered as a perception by them.[2]

If this principle be correct, not much difficulty remains in the case. The land conveyed in trust by Bently for the use of Barkley, was purchased by him in his own name,

---

[2] Our act of assembly authorizes the superior courts of chancery, upon the petition of any of the parties interested, by order of court, made after hearing the parties, to empower the guardian to make or take a surrender of a former lease, or to take or make a new lease as the case may require, and as it shall seem most to the advantage of the infant; out of whose estate any fine that may be advanced, and all other just expenses that may be incurred, in order to obtain a new lease to him, shall be reimbursed; and the new lease shall not only be chargeable with such fine and expenses, but shall remain subject to all encumbrances which the lease surrendered would have been subject to. 1 Rev. Code, 1819, p. 408, §§ 13, 14; Act 1785, from 29 Geo. II. c. 31. In Hedges v. Riker, 5 Johns. Ch. 163, the testatrix devised to her executors, in trust, for the sole use and benefit of her daughter (the plaintiff), the whole income, rents, and profits of her estate, real and personal, subject to the payment of the legacies and dispositions afterwards mentioned: the said rents, &c. to be paid to the daughter during her natural life, for her proper use and benefit, and that of her children, if any, and after her death, to her child or children, in fee. The will empowered the executors, "to sell and dispose of so much of the real estate as should be necessary to fulfill the will." Upon a bill filed by the daughter, (and her husband,) praying that the executors should be decreed to make leases of portions of the real property, on certain stipulated conditions for the term of twenty-one years, the principal defendants being infants, Chancellor Kent said: That he inclined to think that the words of the will, giving to the executors power "to sell and dispose of so much of the real estate as should be necessary to fulfil the will," would authorize them to dispose of vacant lots by lease, according to the prayer of the bill, inasmuch as such a disposition was requisite to carry into effect the intentions of the will. That the greater power included the less, and would authorize, in case of necessity, a more confined and limited exercise of the power: That a lease for years was still a disposition of the estate, within the terms of the power; but that without resorting to the power, the general jurisdiction of the court over the property of infants, was adequate to confer the authority. The court stood, as Lord Nottingham observed, in loco parentis: and it was understood to be clearly settled (3 Johns. Ch. 370), that the court might change the estate of infants from real into personal, and from personal into real, whenever it deemed such a proceeding most beneficial to the infants. It was declared by the lords commissioners in Cecil v. Earl of Salisbury, 2 Vern. 224, that the court had often decreed building leases, for sixty years, of infants' estates, when for their benefit. The prayer of the bill was granted accordingly.

under a verbal declaration that he bid for the plaintiffs. In consequence of this declaration, he purchased the lands at about half their value, and the infants have the benefit of this purchase. As the commissioners could not have sold to the infants and returned them as the purchasers, Bently was necessarily the legal purchaser, and was so returned, and must have been so returned, to the court of chancery. The right of the infants is an equity growing out of the conduct of Bently, which is extrinsic of the regular proceedings, and forms no part of them. The commissioner of the court, acting in strict conformity with his power, is, I think, so far as this question goes, not to be distinguished from a person holding the legal estate. All the rights of those who were parties to the decree are in him. Bently is, therefore, to be considered as purchasing from the person holding the legal estate. If this be correct, the right of a person holding Bently's title, were he a mere purchaser from or creditor of Bently, would be very much in the situation of Williamson, in the case decided in the court of appeals.[3] But Mrs. Barkley presents herself in a still more favourable point of view. A part of her debt is for money received for the plaintiffs, by a person who had a right to receive it. If it

<hr>

[3] Williamson v. Gordon's Ex'rs. 5 Munf. 257. In that case, St. Clair executed a deed of trust to Clarke, for the benefit of certain creditors of St. Clair, and the deed was duly recorded. Subsequently, St. Clair, being indebted to Gordon by bond, on which suit was pending, agreed to confess judgment, and to secure the payment thereof by a deed of trust on the property conveyed in trust to Clarke. After the agreement was executed, St. Clair confessed the judgment, but did not execute the deed of trust. Some months after this agreement was entered into, Williamson purchased of St. Clair, with the assent of the trustee, the property conveyed to Clarke, without notice of the agreement between St. Clair and Gordon, and St. Clair conveyed the same to Williamson, by deed of bargain and sale. The deed to Williamson was not recorded, until five years after its execution; but possession was immediately delivered to him, and he, thereupon, undertook to pay, and actually paid, the debts, to secure which, the deed from St. Clair to Clarke was executed: but Clarke never made any release or conveyance to Williamson. Gordon filed his bill against St. Clair, (without making Williamson a party,) to carry St. Clair's agreement into effect, and the chancellor decreed a sale. The commissioner of the court advertised the property, and Williamson filed his bill of injunction, making St. Clair and Gordon's executors, parties defendants, praying an injunction, to prevent the intended sale, and a decree quieting the complainant in his possession, or that the money advanced by him should first be reimbursed out of the proceeds of sale, and for general relief. The chancellor, on the hearing, dissolved the injunction, and the plaintiff appealed. The court of appeals said, that the decree of the chancellor was erroneous, inasmuch as Williamson had the preferable right to call for the legal estate of the premises in question, outstanding in the trustee, Clarke, and that he should, consequently, have been protected from the claim of Gordon's executors: and the court decreed, that the injunction awarded to Williamson, be made perpetual, and that he be quieted in his possession. &c.

was diverted from its proper course, and wasted, it is in no degree the fault of Barkley. Hard then as it is on the infants, to bear the losses consequent on the misconduct of the guardian, I cannot relieve them from it, by throwing it upon Barkley. So far as the money of Barkley was received by Bently, for the use of the plaintiffs, her equity appears to me, to be still superior to theirs; and if the conveyance of January, 1806, should ·be construed to make the grantees, trustees for Ronald's heirs. still I think their equity stands charged with the rights of Barkley on them.

The result of this opinion is, that the trust estate is bound to Barkley for the balance remaining unpaid, of the value of the extended lands, from the date of the inquest, until the institution of the ejectment, and from the 28th day of January, 1806, until August, 1807, when the extended lands were purchased under a decree of this court. That the purchasers under that decree, ought to pay the annual value of the lands by them severally purchased, as estimated in the inquest, until the debt of Anne Barkley might have been made, adding thereto, the time during which the ejectment, brought by Anne Barkley for those lands, was depending. If any loss has been sustained, by the rents of the extended lands, since they were rented out by the officer of the court; that loss must be borne by the owners, unless there be particular circumstances, which should place it elsewhere.

The result of the best consideration the court can give this subject, is, that upon receiving what remains due to Anne Barkley, according to the judgment of the court, and the inquest of the jury, for the time that the extended lands were held by the plaintiffs, with the acquiescence of the said Barkley, John Wickham, the surviving trustee in the deed of January, 1806, ought to convey to the plaintiffs, and that James Pleasants, the surviving commissioner, acting under the decree of that court, ought to be considered as a trustee for Anne Barkley, until so much of her debt as, according to this opinion, the plaintiffs ought to pay, be satisfied, and then to the use of the plaintiffs.

Decree: 1. That the tract of land, containing 600 acres, purchased by William Bently, in January, 1797, and afterwards conveyed by him to Edward Carrington, and John Wickham, was purchased, in trust for the plaintiffs, and ought to be conveyed to them. 2. That Anne Barkley has a lien on said land, for so much of her judgment, under which the lands of the plaintiffs, in Powhatan and Goochland, were extended, as remains unpaid, and is equal to the annual value of said lands, while they remained in possession of the plaintiffs, with the assent of Anne Barkley, amounting, by an estimate made by the parties, to $1,143.46. 3. That the purchasers of the extended lands, Fenwick, Johnson, and M'Coull, pay to Anne

Barkley, the annual value of the extended lands, respectively purchased by them, from the date of their purchase, until the judgment might have been satisfied, adding thereto the value for the time that the ejectment brought by Anne Barkley, against William Bently, was pending. 4. That on the plaintiffs paying to Anne Barkley, $1,143.46, with interest from the date of this decree, John Wickham convey to the plaintiffs, without warranty, the tract of land conveyed to Edward Carrington, and said Wickham, by deed of 28th of January, 1806: and that James Pleasants, convey to the plaintiffs, the same tract of land, on their producing to him the receipt of Anne Barkley, showing that the sum of $1,143.46 has been paid, and his receiving evidence, that the money has also been paid, for which the same land was sold by him, as commissioner, to William Bently.